IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| DDA FAMILY LIMITED PARTNERSHIP, a Utah limited partnership,<br><br>    Plaintiff,<br><br><br><br>           vs.<br><br><br>CITY OF MOAB, a Utah municipal corporation, and JOHN DOES 1-10,<br><br>    Defendants. | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br><br><br><br>Case No. 2:04-CV-00392 PGC |

    This is a classic case for proving the rule that "[f]ederal courts should be reluctant to interfere with zoning disputes which are local concerns."[1] Plaintiff DDA Family Limited Partnership challenges the failure of the defendant City of Moab to approve a proposed subdivision. Moab concluded that part of the subdivision would have been built on a flood plain, in violation of requirement imposed by the Federal Emergency Management Agency (FEMA). DDA claims that this decision was reached in violation of its federal and state constitutional rights. Moab now moves for summary judgment on all of plaintiff DDA Family Limited Partnership's claims (#51). Moab also moves for attorneys' fees (#51). Having carefully

---

[1]*Norton v. Village of Corrales*, 103 F.3d 928, 933 (10th Cir. 1996).

reviewed the pleadings, the court finds summary judgment is appropriate in favor of Moab.

Attorneys' fees, however, are not.  Accordingly, the court GRANTS Moab's motion for summary

judgment (#51) and DENIES its motion for attorneys' fees and costs (#51).

## FINDINGS OF FACT

For purposes of resolving the pending motions, the court finds the following facts.

*A. DDA's Interaction with Moab.*

DDA owns a 19-acre parcel of property in east Moab, of which most is zoned as a

residential zone under Moab's City Code.  DDA began to explore options for developing this

parcel into a residential subdivision in 1997, but believed Moab bore some animosity resulting

from two of DDA's activities.  First, in 1989, sixteen years before filing this action and eight

years before DDA began to seek developing rights, DDA turned down Moab's request for a

public road easement through its property.  Second, DDA filed a lawsuit against Moab in early

1997 concerning subdivision approval granted to a neighboring property owner.  Despite the

perceived animosity, DDA retained engineers to create a subdivision design for its residential

property and submitted the necessary application documents on December 30, 1997.

Moab returned the preliminary plat and application fee with a copy of the city code

section, and then asserted "more than a dozen different reasons for rejecting DDA's application

three separate times over the course of three months."[2]  DDA alleges it was given no notice of

Moab Planning Commission hearings at which its application was disapproved.  So in its second

---

[2]DDA's Mem. in Opp. to Moab's Mot. for Summ. J., at 2, Docket No. 53 (Mar. 20, 2006).

attempt at preliminary plat approval on February 26, 1998, DDA submitted a revised preliminary

plat addressing six concerns raised by Moab that "were arguably legitimate."[3]  DDA also

"specifically requested notice of any [Planning Commission] hearing at which [its] Application

would be considered."[4]  Moab then informed DDA that the application had again been reviewed

and disapproved, although DDA states it failed to receive notice of the hearing or an opportunity

to be heard yet again.  In this iteration, Moab listed four reasons for disapproval, one of them

dealing with the fire hydrant placement.  DDA responded that fire hydrant placement was not

included "among the items required to be displayed on the preliminary plat map under" Moab

City Code § 16.12.030.[5]  Moab also noted that part of the subdivision was in the FC-1 zone,

which is an area that cannot be developed as part of a subdivision, although DDA's counsel

vigorously contended that assertion.

　　　　After subsequent conversations and consideration again by the Moab Planning

Commission, DDA's application remained tabled until August 1999.  Moab then claimed that it

needed to review DDA's engineering data to determine the appropriateness of the subdivision

after DDA again demanded action on its application.  At Moab's request, by October 2000, DDA

submitted computer modeling data generated by its engineers to ensure the subdivision's lots did

not encroach on Moab's regulatory floodway.  Moab responded to this data by referring DDA to

Moab City Code § 17.33.020, which does not permit residential use subdivisions within FC-1

---

[3]Complaint, at 5.

[4]*Id*.

[5]*Id*. at 6.

flood channel zone.  Moab then failed to review the data as DDA's application remained tabled for 18 months.

On May 23, 2002, Moab again considered DDA's application.  It tabled the application because of lack of adequate information to process the application.  Moab then imposed two requirements on DDA before it could proceed: first, that DDA obtain a rezone of the areas within the FC-1 zone, and, second, that DDA secure FEMA approval of the change to the floodway boundary.  DDA's application was then considered by Moab for a fifth time on October 9, 2003.  Moab approved the application, but conditioned approval on five requirements, including the two described in its May 23, 2002 hearing.  DDA satisfied three of these five requirements by January 22, 2004, and petitioned Moab for rezone of the property out of the FC-1 flood boundary.  Moab denied DDA's rezone petition four months later.

*B. FIRMs, FEMA, Floods, and Zoning.*

Of particular relevance to this case is the National Flood Insurance Program, which provides subsidized flood insurance for structures in flood-prone areas, while also discouraging future unsafe construction in those areas.[6]  It seeks to minimize "future flooding hazards through sound flood-plain management . . . [and is] achieved through the enactment and enforcement of local ordinances."[7]  In order to be eligible for NFIP insurance, local communities must adopt floodplain management ordinances that are consistent with FEMA's minimum eligibility

---

[6]42 U.S.C. §§ 4011-12.  *See* S. REP. NO. 583, 93d Cong., 1st Sess. at 2-3 (1973).

[7]*Adolph v. FEMA*, 854 F.2d 732, 734 n.2 (5th Cir. 1988).

criteria.[8]  "Failure to enact and enforce [certain] minimum measures requires that such non-

complying communities be 'suspended' from the NFIP."[9]

FEMA is authorized by statute to create flood plain maps.[10]  It is undisputed that FEMA

created a Flood Insurance Rate Map (FIRM) covering DDA's property at issue.  A FIRM is "an

official map of the community" on which the Federal Insurance Administrator has delineated

"special hazard areas" and the risk premium zones applicable to that community.[11]  Once FEMA

issues a FIRM for a particular community, all new construction and substantial improvements of

residential structures in the community that fall with FIRM Zones A1-30, AE, and AH must have

the lowest floor (including the basement) elevated to or above the base flood level for that zone.[12]

These FIRMs "are used approximately 15 million times each year for developing State and

community floodplain management regulations . . . [and] FEMA has promulgated regulations

governing the development and revision of flood maps."[13]

According to 44 C.F.R. § 60.3(c)(10),

When the Administrator has provided a notice of final flood elevations for one or more
special flood hazard areas on the community's FIRM, but has not identified a regulatory
floodway or coast high hazard area, the community shall . . . [r]equire until a regulatory

---

[8]42 U.S.C. § 4012(c)(2).

[9]*Id*. (citing 44 U.S.C. §§ 4012(c), 4022, 4102, 4106(a)).

[10]44 U.S.C. § 4101(a).

[11]44 C.F.R. § 59.1.

[12]44 C.F.R. § 60.3(c)(2).

[13]*Nat'l Wildlife Fed'n v. FEMA*, 345 F. Supp. 2d 1151, 1164 (W.D. Wa. 2004) (citing 44
C.F.R. §§ 65.5, 65.6; 44 C.F.R. pt. 72).

floodway is designated, that no new construction . . . or other development (including fill) shall be permitted within Zones A1-30 and AE on the community's FIRM, unless it is demonstrated that the cumulative effect of the proposed development, when combined with all other existing and anticipated development, will not increase the water surface elevation of the base flood more than one foot at any point within the community.

After the regulatory floodway is designated, however, 44 C.F.R. 60.3(d) applies, which

requires the community to

Select and adopt a regulatory floodway based on the principle that the area chosen for the regulatory floodway must be designated to carry the waters of the base flood, without increasing the water surface elevation of that flood more than one foot at any point,[14] and . . .
[p]rohibit encroachments, including fill, new construction, substantial improvements, and other development within the adopted regulatory floodway unless it has been demonstrated through hydrologic and hydraulic analyses preformed in accordance with standard engineering practice that the proposed encroachment would not result in any increase in flood levels within the community during the occurrence of the base flood discharge.[15]

Additionally, if the community seeks to allow encroachments that would affect the base flood

discharge, it

may permit encroachments within the adopted regulatory floodway that would result in an increase in base flood elevations, provided that the community first applies for a conditional FIRM and floodway revision, fulfills the requirements for such revisions as established under [44 C.F.R. § 65.12], and receives approval of the Administrator.[16]

The community has the ability to apply for a conditional FIRM and floodway revision,

but property owners may do so as well.  "Individual property owners who have filled the

floodplain can petition FEMA to have their property removed from a flood area through a Letter

---

[14] 44 C.F.R. 60.3(d)(2).

[15] 44 C.F.R. 60.3(d)(3).

[16] 44 C.F.R. 60.3(d)(4).

of Map Revision based on Fill, [and once] property is removed from the floodplain it is no longer necessary for the property developer to comply with the community's floodplain management regulations."[17]

   *C. Moab's City Code and More Floods.*

   Moab's City Code provides for "areas of special flood hazard identified by" FEMA in the December 1979 "Flood Insurance Study for the Moab City Corporation."[18]  This city code references "an accompanying [FIRM]," which is "adopted by reference and declared to be a part of this chapter."[19]  As part of these Moab City ordinances, the "zoning administrator shall make interpretations, where needed, as to the exact location of the boundaries of special flood hazards."[20]  Areas within the special flood hazard area established by Moab City Code § 15.40.070 are designated as floodways, and certain encroachments, fill and new construction are prohibited in these floodways "unless certification by a registered professional engineer or architect is provided demonstrating that encroachments shall not result in any increase in flood levels during the occurrence of the base flood discharge."[21]  No construction can be undertaken in violation of these Moab City ordinances, and violations result in class B misdemeanors, fines of

---

[17] *Nat'l Wildlife Fed'n*, 345 F. Supp. 2d at 1164.

[18] Moab City Code § 15.40.070.

[19] *Id.*

[20] *Id.* § 15.40.180.

[21] *Id.* § 15.40.300.

not more than one thousand dollars, or imprisonment for not more than six months.[22]  And,

> No building or structure shall be constructed within the FC-1 zone or within the floodway boundary as identified and adopted by this city through the flood damage prevention ordinance except that the board of adjustments may permit the construction of a building or structure within the aforementioned areas in accordance with the city flood damage prevention ordinance.[23]

A major disputed issue in this case is whether certain lots in the preliminary plot submitted by DDA are wholly or partially located within the FC-1 zone or floodway.  DDA contends that none of the lots shown on the preliminary plat are within that zone, whereas Moab argues that certain lots are within that zoned area.  Moab City Code § 17.33.010 discusses the primary purpose of the FC-1 flood channel zone and states that "[t]erritory within this zone is characterized by open land which is free of structures and buildings that are likely to be damaged."[24]  "[N]o regulation pertaining to area, width or location of building requirements in the FC-1 flood channel zone" is permitted, thereby eliminating any development in that zone. The main issue at stake thus is whether part of DDA's property lies in the FC-1 zone, or not.  If it does, then any FC-1 zoned property cannot be developed unless it is rezoned or approved by the board of adjustment.

According to 44 C.F.R. § 60.3, FEMA provides "the data upon which flood plain management regulations shall be based."  If it has not provided sufficient data to furnish a basis for flood plain management regulations in a particular community, "the community shall obtain,

---

[22]*Id*. § 15.40.310.

[23]*Id*. § 17.09.620.

[24]*Id*. § 17.33.010.

review and reasonably utilize data available from other Federal, State or other sources."[25]  But

"when special flood hazard area designations and water surface elevations have been furnished . .

. they shall apply."[26]  According to Moab City Ordinance 92-13, "the Moab Flood Control Zone

(FC-1) shall concur and match the Floodway as defined by the Moab City Flood Damage

Prevention Ordinance."  That "'Floodway' means the channel of a river or other watercourse and

the adjacent land areas that must be reserved in order to discharge the base flood without

cumulatively increasing the water surface elevation more than one foot."[27]

    Moab has designated the regulatory floodway in accordance with FEMA regulations, but

has not specified that floodway on a map.  Since the floodway has been designated by Moab, 44

C.F.R. § 60.3(d) applies to any changes to that floodway.  Moab is to "[p]rohibit encroachments,

including fill, new construction, substantial improvements, and other development within the

adopted regulatory floodway," but may permit new construction if the application demonstrates it

"would not result in any increase in flood levels within the community during the occurrence of

the base flood discharge."[28]  It appears to the court that although Moab statutorily set the

regulatory floodway, it did not place it on the official city map.  Moab's City Council believe the

100-year flood line to be the regulatory floodway, whereas DDA believes that the floodway is an

amorphous area that changes depending on whether the discharge of the base flood area would

---

[25]44 C.F.R. § 60.3.

[26]*Id*.

[27]Moab City Code § 15.40.050.

[28]44 C.F.R. 60.3(d)(3).

not raise the water surface elevation more than one foot.

## DISCUSSION

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[29]  The court must view the evidence, and draw reasonable inferences from that evidence, in the light most favorable to the nonmoving party, which is DDA.[30]  DDA may not, however, "rest on mere allegations or denials of [its] pleading, but must set forth specific facts showing there is a genuine issue for trial."[31]

*A. Moab is Entitled to Summary Judgment*

DDA's Second Amended Complaint alleges claims of deprivation of DDA's constitutional rights "in violation of 42 U.S.C. § 1983," a declaration of rights and other legal relations under 28 U.S.C. § 2201, "deprivation of DDA's rights of procedural and substantive due process under the Fifth and Fourteenth Amendments," a "denial of DDA's rights to the equal protection of laws under the Fourteenth Amendment," a "denial of DDA's rights to substantive and procedural due process under" Utah Const. art. I, § 7, violation of DDA's rights under Utah Const. art. I, § 24, and violation of Utah Code Ann. § 10-9-1001.  DDA also concedes that its

---

[29]Fed. R. Civ. P. Rule 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Cummings v. Norton*, 393 F.3d 1186, 1189 (10th Cir. 2005).

[30]*Cummings*, 393 F.3d at 1189; *Spaulding v. United States*, 279 F.3d 901, 904 (10th Cir. 2002).

[31]*Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986).

conspiracy claim under 42 U.S.C. § 1985 is not viable now that it has dismissed its claims

against the individual defendants, so the court dismisses that claim without prejudice.

"Land use planning has traditionally been considered a matter of local concern and

Congress has not been hospitable to demands that it preempt the field."[32]  Indeed, there "is a

considerable body of opinion, well represented in Congress, that in most cases land use

decisionmaking should be a state and local, not a federal concern."[33]  DDA asks the court to

"interpret Moab's ordinances as a matter of law and conclude, first, that Moab had no discretion

to deny DDA's fully conforming preliminary plat application, and, second, that the ostensible

basis for its denial bears no rational relationship to any legitimate police power objective."[34]

Since it claims these "are the two components of the test for [§] 1983 liability, [then the] analysis

establishing the[se] components in DDA's favor also establishes the validity of DDA's other

claims in this matter."[35]

What is initially confusing about DDA's second amended complaint is that it claims

deprivation of constitutional rights in violation of § 1983.  Section 1983 provides a "civil action

for deprivation of rights," which offers a civil action to any person deprived of rights secured by

the Constitution.  DDA's claims of denial of substantive and procedural due process rights under

the Fifth and Fourteenth Amendments, along with its equal protection claim, are the "rights

---

[32]*Cape May Greene, Inc. v. Warren*, 698 F.2d 179, 187 (3d Cir. 1983).

[33]B.H. Holmes, *Federal Participation in Land Use Decisionmaking at the Water's Edge–Floodplains and Wetlands*, 13 Nat. Reources Law. 351 352 (1980-91).

[34]DDA's Memo. in Opp., at 3.

[35]*Id*.

privileges, or immunities secured by the Constitution and laws" which may give rise to a civil action under 42 U.S.C. § 1983.  Thus, several of DDA's claims are actually one and the same, as DDA's alleged deprivation of constitutional rights "in violation of 42 U.S.C. § 1983," and its alleged deprivation of named constitutional rights, including substantive and procedural due process and equal protection, all give rise to a § 1983 claim. Therefore, the court will combine the "general constitutional rights" claim into the rubric of each specified constitutional claim and analyze each of them in turn.

*1. DDA's Procedural Due Process Claim Fails.*

"A § 1983 action may be brought for a violation of procedural due process, but here the existence of state remedies *is* relevant in a special sense. . . . The constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process."[36]  As such, the relevant inquiry for a procedural due process claim under § 1983 is "to ask what process the State provided, and whether it was constitutionally adequate."[37]

Looking specifically at Utah zoning law, the Tenth Circuit has discussed zoning ordinances in depth.  "Under the Utah Municipal Land Use Code, a municipal subdivision of the State may enact a zoning ordinance and divide the territory over which it has jurisdiction into various zoning districts."[38]  "The Land Use Code also directs each municipality adopting such a

---

[36]*Zinermon v. Burch*, 494 U.S. 113, 125-26 (1990).

[37]*Id*. at 126.

[38]*Bateman v. City of W. Bountiful*, 89 F.3d 704, 706-07 (10th Cir. 1996) (citing Utah Code Ann. §§ 10-9-401 to 405).

zoning ordinance to appoint a board of adjustment."[39]  "The board of adjustment has the authority to hear and decide: (1) appeals from decisions applying the zoning ordinance; (2) special exceptions to the terms of the zoning ordinance; and (3) variances from the terms of the zoning ordinances."[40]  And this board of adjustment is empowered to make determinations regarding the existence of "nonconforming uses" if that authority is delegated to it by the legislative body.[41]  Accordingly, under Utah law, the board of adjustment has the authority to make a final determination regarding DDA's property.  Then, under Moab City Code,  "[t]hose aggrieved by the decision of the board of adjustment . . . may appeal such decision to the Seventh Judicial District Court, as provided in Utah State Statutes."[42]

As to the issue of challenges to zoning, Moab argues that DDA's federal claims are not ripe because DDA has failed to exhaust its remedies or appeal the Planning Commission's decisions.  A ripeness challenge bears on the court's subject matter jurisdiction under Article III of the Constitution.[43]  Such a ripeness inquiry requires the court to evaluate "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."[44]

DDA has sought review by the Planning Commission and the Moab City Council.  Moab

---

[39]*Id*. (citing Utah Code Ann. § 10-9-701).

[40]*Id*. (citing Utah Code Ann. § 10-9-703).

[41]*Id*.

[42]Moab City Code § 15.40.190(C).

[43]*New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1498-99 (10th Cir. 1995).

[44]*Abbott Labs v. Gardner*, 387 U.S. 136, 149 (1967).

gives the Board of Adjustments the ability to hear any appeal from any "staff action; request for variance; or appeal regarding the grant, denial, or conditions attached to any permit" under the zoning chapter.[45]  Moab also allows for appeal to the Board of Adjustments of a decision or variance by any "person who . . . objects to . . . any interpretation of [the Moab Buildings and Construction] chapter or [Moab's Municipal code]."[46]  And the "decision of the Board of Adjustments can be contested and/or appealed only through the judicial system per Utah State Law."  Counsel for both sides concede that Moab has created a Board of Adjustments, but DDA argues that it had already passed the point at which the Board of Adjustments may review its preliminary plat application or any request to rezone.  At this point in time, Moab and DDA differ on whether part of the preliminary plat lies in the FC-1 zone, which appears to be an "interpretation" of the Moab Building and Construction chapter or Moab City Code.  Such is *exactly* what the Board of Adjustments appears to have jurisdiction over, and one may then appeal a decision by the Board of Adjustments to the Seventh Judicial District Court.[47] Whichever body is right, either DDA or Moab, this should have been brought to the Board of Adjustments, and then to the "Seventh Judicial District Court, as provided in Utah State Statutes."[48]  Whatever the case, it is clear that DDA has not sought review on its application or its request for a rezone to the Board of Adjustments under Moab City Code.  It thus appears to the

---

[45]Moab City Code § 17.55.100.

[46]*Id*. § 15.44.380.

[47]*Id*. § 15.40.190(C).

[48]*Id*.

court that DDA has not sought review by the proper body, and that this claim is not ripe in federal court.

In addition, although DDA never received direct personal notice of the hearings at issue, it is undisputed that Moab followed its statutory procedures and provided a "notice of time and place of such hearing . . . published in a newspaper of general circulation."[49]  In this vein, DDA argues that Moab had to wait fifteen days before approving or disapproving plans because the ordinance provides that the preliminary plat "shall be filed at least fifteen days prior to the planning commission meeting at which time the plat may be considered."[50]  A plain reading of this statute does not prohibit Moab from considering preliminary plats that have been filed after a planning commission meeting has already been scheduled and noticed to the community.

In short, DDA has not sought final determination on the relief that it seeks, especially because it has only sought relief from the Planning Commission and Moab City Council.  Thus, DDA's procedural due process claims are not ripe.  Since DDA has not availed itself to the state procedures which allow for appeals to the Board of Adjustments or through the judicial system per Utah State Law, the court is in no position to determine whether DDA has been denied procedural due process.

*2. DDA's Substantive Due Process Claim Fails.*

In evaluating substantive due process claims, this court "must bear in mind three basic principles highlighted by the Supreme Court: (1) the need for restraint in defining their scope; (2)

---

[49]*Id*. § 17.12.160.

[50]*Id*. § 16.08.010

the concern that § 1983 not replace state tort law; and (3) the need for deference to policymaking

bodies in making decisions impacting upon public safety."[51]   The Tenth Circuit has noted that

"absent invidious discrimination, the presence of a suspect class, or infringement of a

fundamental interest, courts have limited their review of quasi-legislative or quasi-judicial zoning

decisions in the fact of a substantive due process challenge to determining whether the decision

was arbitrary and capricious."[52]   And the Fourth Circuit has recognized that "the Supreme Court

has narrowed the scope of substantive due process protection in the zoning context so that such a

claim can survive only if the alleged purpose behind the state action has no conceivable rational

relationship to the exercise of the state's traditional police power through zoning."[53]

Under *Norton v. Village of Corrales*,[54] DDA must first demonstrate "entitlement" to the

approval sought.[55]   DDA argues that since it met the requirements for preliminary plat approval,

the ordinance leaves no discretion to deny the application.   DDA cites entitlement language in

*Western Land Equities v. Logan*,[56] a 1980 Utah Supreme Court case which held that "an

applicant for subdivision approval . . . is entitled to favorable action if the application conforms

to the zoning ordinance in effect at the time of the application . . . unless the municipality can

---

[51]*Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir. 1995).

[52]*Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence*, 927 F.2d 1111, 1119 (10th Cir. 1991); *see also Norton v. Village of Corrales*, 103 F.3d 928, 932 (10th Cir. 1996).

[53]*Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 829 (4th Cir. 1995).

[54]103 F.3d 928.

[55]*Id*. at 931-32.

[56]617 P.2d 388 (Utah 1980).

show a compelling reason for exercising its police power retroactively to the date of application."[57]  Subsequent cases limit this holding greatly.  The Utah Court of Appeals has "uncovered no authority that suggests a property owner has a vested property right in a contemplated development or subdivision,"[58] indicating that discretionary ordinances will trump certain alleged property rights.  According to the Utah Supreme Court, "[m]any courts have held that adverse municipal land-use decisions are not actionable under § 1983 because a developer does not typically have an entitlement to a favorable decision."[59]  And the Utah Supreme Court explicitly limited *Western Land Equities* to "the facts in that case."[60]  Besides the fact that *Western Land Equities* is not a § 1983 case, the Utah Supreme Court noted that extending its holding would supplant "the ability of [a municipality] to protect the public interest in specific land development cases . . . by a rule that mere adherence to formal requirements always entitles a developer to approval, whatever the countervailing public interests might be."[61]  DDA fails to persuasively demonstrate its entitlement according to current Utah state law.

Moab also appears to possess the discretion to deny the application based on the plain language of its preliminary plan approval ordinance.  "*If* the [preliminary] plat is approved, the planning commission shall express its written approval with whatever conditions are attached . . .

---

[57]*Id*. at 391.

[58]*Spencer v. Pleasant View*, 80 P.3d 546,  (Ut. Ct. App. 2003)

[59]*Patterson v. Am. Fork City*, 67 P.3d 466, 473 (Utah 2003).

[60]*Id*. at 474.

[61]*Id*.

. *If* the preliminary plat is disapproved, the planning commission shall indicate its disapproval in writing and give reason for such disapproval."[62]  The use of the terms "if," rather than "when," in the Moab City Code certainly suggests the planning commission's has discretion to approve or disapprove preliminary plats.  DDA has failed to demonstrate its entitlement to the planning commission's approval of its preliminary plat.[63]

Additionally, even if Moab did not have discretion to deny DDA's preliminary plat application, DDA must show that Moab's actions were arbitrary and capricious.  Such a showing "in this context does not mean simply erroneous,"[64] as "'the legality of a zoning decision under applicable state law is not determinative of whether the decision violated federal substantive law.'"[65]  Moab alleges it had a reasonable basis for not accepting DDA's preliminary plat application, although it did take some time for Moab to put forward those reasons.

Moab's flood damage reduction section explains Moab's purpose in maintaining flood zoning regulations.[66]  Moab uses a number of methods to reduce flood loss, including restricting or prohibiting certain land uses, controlling filling, grading and other development which may increase flood damage, and requiring certain areas to be protected against flood damage.[67]  Due

---

[62]Moab City Code § 16.12.050 (emphases added).

[63]*See Norton*, 130 F.3d at 932.

[64]*Id.*

[65]*Id.* (quoting *Sylvia Dev. Corp*, 48 F.3d at 829)).

[66]Moab City Code § 15.40.030.

[67]*Id.* § 15.40.040.

to the need to ensure public safety, among other reasons, Moab requires compliance with its

flood damage reduction chapter and prohibits construction without such full compliance.[68]  Any

interpretation of the requirements in the flood damage reduction chapter are also liberally

construed in favor of the governing body.[69]  Moab's further regulations provide for a zoning

administrator to "review all development permits to determine if the proposed development is

located in the floodway" and "assure that the encroachment provisions [of Moab City Code] are

met."[70]  And under § 15.40.300A, new construction is prohibited by Moab unless it can be shown

that such construction will not result in *any* increase in flood levels during the occurrence of a

base flood discharge.[71]  Moab has laid out these conditions in order to ensure that hazardous

areas "due to the velocity of floodwaters which carry debris, potential projectiles, and erosion

potential" are not developed without maintaining the same flood levels.[72]

Given Moab's City Code and the purpose behind Moab's regulations, it is clear that

Moab has a legitimate state interest in managing floodplain development.  Although whether the

preliminary plat is located within the FC-1 zone is a disputed issue of fact, it is undisputed that

DDA has not sought appeal from the Board of Adjustments or the Seventh Judicial District Court

to alter Moab's current regulations.  Accordingly, Moab has a rational basis for its belief that part

---

[68]*Id*. § 15.40.075.

[69]*Id*. § 15.40.090(C).

[70]*Id*. § 15.40.140.

[71]*Id*. § 15.40.300A.

[72]*Id*.

of the preliminary plat is located in the FC-1 zone, and Moab clearly has the legitimate state interest to prohibit or regulate development within the floodplain.

Moab's power to regulate development within the floodplain is also rationally related to legitimate state interests. The danger that occurs with uncontrolled development within the floodplain, both to the residents in that floodplain as well as to the general residents of Moab, is clear. Since the court finds that the articulated reasons for failing to approve DDA's preliminary plat application had a rational relationship to a legitimate state interest, DDA's substantive due process claim must fail.

### 3. DDA's Equal Protection Claim Fails.

DDA also alleges that Moab deprived it of equal protection of the laws in violation of the Fourteenth Amendment. To bring an equal protection violation claim regarding a zoning decision, DDA "must present evidence that [Moab] *deliberately* sought to deprive [it] of the equal protection of the laws for reasons of a personal nature unrelated to the duties of [Moab's] position."[73] As the Seventh Circuit has explained, a showing of "uneven" enforcement is insufficient; instead, there must be a showing of a "totally illegitimate animus toward" a plaintiff like DDA.[74]

DDA has not met the burden of providing evidence proving totally illegitimate animus toward DDA by Moab. DDA has made general allegations against Moab, pointing to the denial of an easement 15 years before it began this suit, and participation in a lawsuit against the city 7

---

[73]*Hilton v. City of Wheeling*, 209 F.3d 1005, 1008 (7th Cir. 2000) (emphasis added).

[74]*Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001).

years before it began this suit.  Because the court finds Moab's actions are reasonable in denying

DDA's preliminary plat application based on the flood control and zoning issues, DDA has not

shown any illegitimate animus by Moab.  DDA has not only failed to produce any statements or

letters from which some sort of animus might be inferred, but has failed to produce any evidence

to demonstrate this illegitimate animus.  Mere allegations, without any other demonstrable proof,

are insufficient to preclude summary judgment on this issue.[75]

DDA claims that Moab laid out four options through which DDA could gain preliminary

plat approval.[76]  Since DDA proceeded with the first option and brought its claim directly to the

Moab City Council, it claims that Moab's subsequent denials demonstrates the requisite animus.

With regard to the first option, DDA quotes Moab's letter as stating that DDA "could elect to

have the application placed upon the next planning commission agenda for review, following

which the matter would be sent to the City Council for final consideration."[77]  DDA fails to quote

the next sentence, which adds that "the existence of building lots within areas zoned FC-1

presents an obvious impediment to approval of the whole application."[78]  Moab then proceeded

to lay out three other options, none of which DDA attempted.  Moab's offering four different

options to proceed exhibits a lack of the requisite animus needed to maintain an equal protection

claim.  Indeed, if fault is to be assigned anywhere, it appears that DDA failed to consider these

---

[75]*Anderson*, 477 U.S. at 256.

[76]March 30, 2001 Letter from Moab's Counsel to DDA's Counsel, Docket No. 53, Ex.O.

[77]*Id*.

[78]*Id*.

other options.  As such, DDA has failed to exhibit to the court any semblance of totally

illegitimate animus by Moab towards DDA's application and the equal protection claim must

fail.

>    *4. DDA's "cause of action" under 28 U.S.C. § 2201 Fails.*

DDA states only that it "is entitled to the Court's declaration regarding the rights and

other legal relations of the parties pursuant to the facts and circumstances alleged" in the

Complaint.[79]  DDA does not seek to invalidate Moab City Code, nor any of the code of federal

regulations.  If DDA's claims had merit, then the court might be in a position to grant declaratory

judgment in its favor under 28 U.S.C. § 2201.  But § 2201 does not give rise to a separate cause

of action under which DDA may bring suit, absent the alleged constitutional violations.  Because

the court finds summary judgment appropriate in Moab's favor on the constitutional violations, it

also finds that DDA's 28 U.S.C. § 2201 "cause of action" is inappropriate.  The court grants

Moab's motion for summary judgment on this cause of action as well.

The court finds that as a matter of law, all of DDA's federal claims are appropriate for

summary judgment in Moab's favor.  Since the court grants Moab summary judgment on DDA's

federal claims, the court is left with DDA's state constitutional claims.  The court declines to

exercise supplemental jurisdiction over these claims, and dismisses those claims without

prejudice.

>    *B. Moab has not Demonstrated Sufficient Grounds for Attorneys' Fees.*

Moab requests reasonable attorney's fees and costs incurred in this matter if it is

---

[79]Complaint, at 16.

meritorious on its summary judgment motion (#51).  Specifically, it seeks these fees despite

being a governmental entity because DDA's complaint was not ripe, beyond the statute of

limitations, did not exhaust the administrative remedies, failed to comply with certain notice

provisions, and was without any valid legal foundation.  Moab believes its public treasury should

not be burdened by the need and expense of defending such "frivolous, unreasonable, or

groundless" claims.[80]

  The Tenth Circuit has held that "[w]hile a prevailing plaintiff is entitled to attorney fees, .

. . a prevailing defendant in a civil rights action may recover attorney fees only if the suit was

vexatious, frivolous, or brought to harass or embarrass the defendant."[81]  In what is clearly a very

complicated area of the law, the defendants have prevailed.  But the entire suit was not vexatious,

frivolous, or brought to harass or embarrass the defendants.  The standard for awarding attorneys'

fees to a defendant "is a difficult standard to meet, to the point that rarely will a case be

sufficiently frivolous to justify imposing attorney fees on the plaintiff."[82]  Moab, although

prevailing in the summary judgment stage, has failed to demonstrate the frivolous, unreasonable

or embarrassing nature of DDA's case.[83]  Accordingly, the court DENIES Moab's motion for

attorneys' fees and costs (#51).

---

[80]*See Browder v. City of Moab*, 427 F.3d 717, 721 (10th Cir. 2005).

[81]*Mitchell v. City of Moore*, 218 F.3d 1190, 1203 (10th Cir. 2000) (citations and internal quotations omitted).

[82]*United States ex rel. Grynberg v. Praxair, Inc.*, 389 F.3d 1038, 1059 (10th Cir. 2004) (internal quotations omitted).

[83]*See also RHN v. Box Elder County*, 416 F. Supp. 2d 1254, 1262 (D. Ut. Feb. 27, 2006).

**CONCLUSION**

For the foregoing reasons, Moab's motion for summary judgment (#51) is GRANTED

with respect to the federal claims.  With respect to the state claims, the court declines to exercise

supplemental jurisdiction over these claims, and those claims are DISMISSED without prejudice.

Moab's motion for attorneys' fees is DENIED (#51).  The Clerk's Office is directed to close this

case.

DATED this 19th day of May, 2006.

BY THE COURT:

_____
Paul G. Cassell
United States District Judge